UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHAWNLEE CONSTRUCTION, LLC,

                              Plaintiff,

        – against –

J.K. SCANLAN COMPANY, INC. and ARCH
INSURANCE COMPANY,

                              Defendants.

---

**OPINION AND ORDER**

12 Civ. 3346 (ER)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SHEPARDVILLE CONSTRUCTION, LLC,

                              Plaintiff,

        – against –

J.K. SCANLAN COMPANY, INC. and ARCH
INSURANCE COMPANY, INC.,

                              Defendants.

---

12 Civ. 3347 (ER)

Ramos, D.J.:

        The instant actions arise from a general contractor's alleged failure to pay two

subcontractors, Shawnlee Construction, LLC ("Shawnlee") and Shepardville Construction, LLC

("Shepardville") (collectively, the "Plaintiffs"), for work that they performed on a multifamily housing project.[1]  Plaintiffs seek to collect the unpaid amount from J.K. Scanlan, the general contractor, as well as Arch Insurance Company, Inc. ("Arch," and together with J.K. Scanlan, "Defendants"), which issued a payment bond in connection with the underlying project.  Compl., Doc. 1.

Currently before the Court are Arch's motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Arch contends that Plaintiffs' suits are time-barred because they failed to commence these actions within one year of the date of completion of the contracted-for work, the limitations period set forth in the payment bond.

For the reasons set forth below, the motions are DENIED.

**I.    Background**

The following facts are undisputed except where otherwise noted.

### A.  The Vineyard Commons Construction Project

On December 2, 2008, J.K. Scanlan entered into a contract (the "Construction Contract") for the construction of a multifamily housing project for the United States Department of Housing and Urban Development ("HUD"), known as "Vineyard Commons" (the "Project"), located in Highland, New York.  Def.'s 56.1 Stmt. ¶ 1, Doc. 29; *see also* Ahern Aff. Ex. A (Baker Dep. 29:24 – 30:12, Dec. 5, 2012), Doc. 38.  The Construction Contract defined "[t]he

---

[1] Plaintiffs initially filed two separate, but related, actions:  docket Nos. 12 Civ. 3346 (ER) and 12 Civ. 3347 (ER). After the close of discovery, Plaintiffs sought consolidation of the cases due to the complete overlap of "issues to be tried or otherwise determined."  G. Sitaras Ltr. dated Jun. 7, 2013.  The parties have filed identical summary judgment briefs under both docket numbers.  Accordingly, the Court consolidates these cases for the purposes of the instant motion.  For the sake of clarity, all docket references herein refer to filings in case No. 12 Civ. 3346 (ER). *See* Mem. L. Supp. Def. Arch's Mot. Summ. J. ("Def.'s Mem."), Doc. 34; Pl. Shawnlee's Mem. L. Opp. Arch Mot. Summ. J. ("Pls.' Opp.") 1, Doc. 40 ("In the interest of brevity, this memorandum of law is being submitted on behalf of both Shawnlee and Shepardville in each of their respective cases."); Reply Mem. Supp. Def. Arch's Mot. Summ. J. ("Def.'s Reply Br."), Doc. 45.

J.K. Scanlan—which only recently filed its answer in this action—did not join Arch in the instant motions.

date of final completion" as "the date the HUD representative signs the final HUD Trip Report

provided that the Trip Report is subsequently endorsed by the Chief Architect."  Def.'s 56.1

Stmt. ¶ 5.  The Construction Contract also required J.K. Scanlan to "correct any defects due to

faulty materials or workmanship which appear within one year from the date of final

completion."  Baker Aff. Ex. 2 (Construction Contract Art. 2 ¶ B), Doc. 33.

> With respect to landscaping, the Construction Contract provides as follows:
>
> The Contractor shall assume full responsibility for the maintenance of all
> landscaping which may be required by the Drawings and Specifications until such
> time as both parties to this Contract shall receive written notice from the
> Commissioner that such landscaping has been finally completed.  The Owner
> hereby agrees to make available to the Contractor, for such purpose, without cost
> to the latter, such facilities as water, hose and sprinkler.

*Id.* at Art. 5 ¶ D.  Finally, the Construction Contract indicates that "the Contractor shall furnish to

the Owner assurance of completion of the work in the form of … 100% Performance and

Payment Bond."  *Id.* at Art. 6.

### 1.  The Subcontracts

Pursuant to written subcontract agreements dated April 5, 2009 and July 13, 2009, J.K.

Scanlan hired Plaintiffs as subcontractors to assist with carpentry related services for the Project.

Sitaras Aff. Ex. A (Feb. 8, 2012 Tolling Agreement), Doc. 36; Rathjen Aff. Ex. A (Jul. 13, 2009

Subcontractor Agreement between J.K. Scanlan and Shawnlee), Doc. 37.[2]  The purpose of the

subcontract with Shawnlee was "to furnish and install all of the work associated with the rough

carpentry package of [the Project], which included all of the framing, the lumber, the material

[and] the installation."  Ahern Aff. Ex. A (Baker Dep. 100:18 – 101:2); Rathjen Aff. Ex. A (Jul.

13, 2009 Subcontractor Agreement between J.K. Scanlan and Shawnlee at Ex. A—"Scope of

---

[2] Though the Rathjen Affidavit purports to include the Shepardville subcontract as Exhibit A, it instead includes a
copy of the *Shawnlee* subcontract; the parties have not provided a copy of the Shepardville subcontract to the Court.

Work").  Shepardville's role was to "provide[] the interior and exterior carpentry as well as miscellaneous door frame and hardware packages," including "siding, exterior siding, trim, porches, railings" and interior doors, frames and molding.  Ahern Aff. Ex. A (Baker Dep. 106:1 – 106:10).

### 2.  The Bond

On or about July 2, 2009, Arch, as surety, issued a payment bond in the penal sum of $36,964,970 on behalf of J.K. Scanlan, as principal, in favor of the owner of the Project, Vineyard Commons Holdings, LLC (the "Owner"), as obligee (the "Bond").  Def.'s 56.1 Stmt. ¶ 2.  The Bond was issued for the "use and benefit" of claimants supplying labor and materials for the Project; in essence, the Bond ensures that J.K. Scanlan properly pays its subcontractors and suppliers.  Baker Aff. Ex. 1 (Bond ¶ 1).  The Bond defines a "claimant" as "one having a direct contract with the Principal or with a subcontractor of the Principal for labor … used or reasonably required for use in the performance of the contract."  *Id.*  Pursuant to the Bond, every claimant "who has not been paid in full before the expiration of a period of ninety (90) days after the date on which the last of such claimant's work or labor was done or performed … may sue on this bond for the use of such claimant."  *Id.* ¶ 2.

Importantly, the Bond requires that all claims brought thereunder must be initiated within one year after J.K. Scanlan, the Principal, "ceased work" on the Construction Contract.  Def.'s 56.1 Stmt. ¶ 3 ("[n]o suit or action shall be commenced hereunder by any claimant … [a]fter the expiration of one (1) year following the date on which Principal ceased work on said Contract.").  Andrew R. Baker, a Vice President at J.K. Scanlan and the Project Manager for Vineyard Commons ("Baker"), signed the Bond on behalf of J.K. Scanlan.  *See* Baker Aff. Ex. 1 (Bond).

4

### 3.   The Final Inspection and Certificate of Substantial Completion

On December 9, 2010, Baker attended the "final inspection" of Vineyard Commons with Charles Hockensmith, the HUD Inspector for the Project, Louis Iesu, another HUD employee, and Jay Diesing of Mauri Associates Architects, P.C., the Project Architect.  Def.'s 56.1 Stmt. ¶ 6; Baker Aff. Ex. 2 (Construction Contract ¶ 1C).  It is undisputed that, on the same day, they issued the "HUD Representative's Trip Report" (the "Trip Report"), which states as follows:

> CONTRACTED WORK IS 100% COMPLETE WITH NO PUNCH LIST ITEMS.
>
> THERE ARE NO ITEMS OF DELAYED COMPLETION.
>
> WORK PERFORMED IN A SATISFACTORY WORK-LIKE MANOR [sic].
>
> ALL UTILITIES ARE COMPLETELY INSTALLED, CONNECTED, OPERABLE AND SAFE.  ALL FACILITIES FOR INGRESS AND EGRESS ARE IN PLACE.

Def.'s 56.1 Stmt. ¶ 7 (citing Baker Aff. ¶ 6, Ex. 3).  The "scheduled progress" and "actual progress" boxes on the Trip Report form contain the value "100%."  Baker Aff. Ex. 3.

On December 10, 2010, the Project Architect, Mr. Diesing, issued an American Institute of Architects ("AIA") standard "Certificate of Substantial Completion" form (the "Certificate of Substantial Completion").  Baker Aff. Ex. 5.  The Certificate of Substantial Completion defines "Substantial Completion" as the stage when the contracted-for work "is sufficiently complete in accordance with the Contract documents so that the Owner can occupy or utilize the Work for its intended use."  *Id.*  On its face, the Certificate of Substantial Completion covers the "Full Project," and states that the "applicable warranties required by the [Construction] Contract Documents" commence on the date of its execution.  *Id.*  Below Mr. Diesing's signature, and above Mr. Baker's signature, the Certificate of Substantial Completion further states that:

A list of items to be completed or corrected is attached hereto.  The failure to include any items on such list does not alter the responsibility of the Contractor to complete all Work in accordance with the Contract Documents.  Unless otherwise agreed to in writing, the date of commencement of warranties for items on the attached list will be the date of issuance of the final Certificate of Payment or the date of final payment.

**Cost estimate of Work that is incomplete or defective:  $0.00.**

The Contractor will complete or correct the Work on the list of items attached hereto within Zero (0) days from the above date of Substantial Completion.

*Id.* (emphasis in original).  The Certificate of Substantial Completion has no attachments. Finally, the Owner of Vineyard Commons signed the Certificate of Substantial Completion,[3] thereby "accept[ing] the Work or designated portion as substantially complete." *Id.*

On December 13, 2010, Mr. Diesing sent a letter to HUD, advising that his office "ha[d] no objection to the release of final payment including retainage to J.K. Scanlan Company, Inc. for [Vineyard Commons]."  Baker Aff. Ex. 6.[4]  On December 16, 2010, Mr. Diesing also signed the "Architect's Certificate" portion of a requisition for work performed up to December 9, 2010, which states, "based on my on-site observations . . . and the data comprising this requis[ition], [] the Work progressed to the point indicated . . . and [] the Contractor is entitled to payment of the amount certified."  *Id.* at Ex. 4.

In support of Arch's motion, Baker has submitted a sworn affidavit representing that, between December 9 and 16, 2010, he, the Project Architect and the HUD Inspector certified the work on the Project as 100% complete.  According to Baker, as of December

---

[3] It is unclear whether the representative for the Owner signed the form on December 10, 2010 or December 17, 2010, as the handwriting is difficult to decipher.

[4] The record does not indicate what, if any, response HUD sent to Mr. Diesing.

2010, J.K. Scanlan was entitled to payment of the entire Contract balance, save for a five

percent retainage that the lender was holding because HUD had not finally endorsed the

Owner's mortgage loan.  Baker Aff. ¶ 7, Ex. 4.  Baker attests, and Plaintiffs dispute, that

he, Mr. Diesing and the Owner "were all in agreement that the Project was fully and

finally complete" in December 2010.  Pls.' Resp. Def.'s 56.1 Stmt. ¶ 8, Doc. 39.[5]

### 4.  Work Performed After December 2010

It is uncontested that Plaintiffs and the landscaper[6] performed work on the Project in

2011.  The critical dispute between the parties concerns the nature of the work performed at

Vineyard Commons after December 2010:  Arch characterizes such work as entirely remedial,

and maintains that the work called for by the Construction Contract was "100% complete" as of

December 2010, whereas Plaintiffs contend that work performed after December 10 was work

called for under the contract and subcontract, including "punch list work."

"'[P]unch list' work" is "work called for by the original contract (or subcontract) which

the contractor (or subcontractor) has not satisfactorily completed."  *See Arch Ins. Co. v.*

*Precision Stone, Inc.*, 584 F.3d 33, 37 (2d Cir. 2009) (citation omitted).  "[A] punch list reflects

contracted-for work that is incomplete or defective.  The contractor must attend to punch list

items without additional compensation, and if it fails to do so, the building owner may correct

the work and backcharge the contractor for its cost."  *Aniero Concrete Co., Inc. v. New York City*

*Const. Auth.*, 308 F. Supp. 2d 164, 199 (S.D.N.Y. 2003).  The parties dispute the meaning of

---

[5] The record is unclear as to exactly when J.K. Scanlan actually received "final payment," however.  At his deposition, discussed *infra*, Baker testified that he did not submit a final requisition for payment of the final retainage to J.K. Scanlan until December 19, 2011, and that J.K. Scanlan did not ultimately get paid until "the middle of February [2012]."  Ahern Aff. Ex. A (Baker Dep. 127:6 – 130:1).

[6] The site contractor, P. Sala & Sons ("Sala"), served as the landscaper on the Project.  Ahern Aff. Ex. A (Baker Dep. 52:3 – 52:7).

Baker's deposition testimony concerning "punch list" work performed in 2011, as compared with his affidavit filed in support of Arch's instant motion, in which he states that no "new work" was conducted on the Project in 2011.  Baker Aff. ¶ 13.

On December 5, 2012, Plaintiffs deposed Baker, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, in his capacity as a corporate representative of J.K. Scanlan.[7]  He brought certain documents with him to the deposition that he described "as … a representation that there was work ongoing in the spring or after … December 31, 2010," including an email dated March 31, 2011 from Gregory Brennan, J.K. Scanlan's superintendent on the Project ("Brennan").  Ahern Aff. Ex. A (Baker Dep. 45:18 – 46:14).  As Baker explained, the email contained a list of items created by the Owner, "some of which had already been addressed and no additional work was required[,] and some of which needed to be corrected or repaired or finished … *I would classify it as punch list work*."  *Id.* at 46:15 – 47:9 (emphasis added).  Baker testified that he personally inspected work at Vineyard Commons described by the March 31, 2011 email—this work, he explained, consisted of "completion [of] the original contract," "not change order items."  *Id.*  Among other things, more "drainage" and "blueprint" work was "completed" or "addressed" in 2011.  *Id.* at 47:10 – 48:1.

Baker also brought to his deposition an "open items" list sent by Brennan on April 22, 2011 via email to the Owner's representative.  Baker Aff. Ex. 8 (Apr. 22, 2011 email).  The April 22, 2011 email indicates that J.K. Scanlan is "moving forward with the remaining open items at Vineyard Commons," and encloses an "updated list" of open items, which details, for example: "door stop came loose … JKS – repaired tile as a favor"; "wood floors separating in many units"; "stain on concrete patio.  Origin unknown"; "master bedroom ceiling shows signs of

---

[7] Baker was not represented by counsel at the deposition.  Baker Aff. ¶ 12.

water damage"; "fire alarm – programming change-over underway"; "tile and grout is cracked at curved wall near mail room"; "leak in refuse [room]"; "electric closet – ceiling repairs"; "stairwells – joints at stringers are opening.  Need to be re-caulked."  *Id.*  The body of the April 22, 2011 email discusses four particular "open items" in detail:  (1) landscaping work; (2) work on "door hardware and tune-ups" to ensure that each building lobby door "function[s] as intended"; (3) repairs to site lights; and (4) work on the fire alarm system, which "*has been an open item since September 2010.*"  *Id.* (emphasis added).

Baker further testified that the "punch list" work performed by subcontractors at Vineyard Commons after April 22, 2011 included "some landscaping work, some door hardware [installation]," work to "adjust[] or tweak" "some front door frames and doors," and work on the "site lighting" and the fire alarm system.  Ahern Aff. Ex. A (Baker Dep. 49:2 – 52:14); *see also id.* at 33:3 – 33:9 ("There were punch list items remaining, and there were landscape items remaining.").  Regarding the "door hardware," Baker testified that "part of Shepardville's contract responsibility on [the Project] was to install door hardware," and that "it [is] fair to say that would be in completion of their work."  *Id.* at 54:4 – 54:24.  With respect to landscaping, Baker testified that the Project consisted of multiple buildings, and "as we would turn over a building, we would landscape that building"; however, "we had issues where we needed to landscape a building because it finished in 2010 in December, and it couldn't be landscaped at that time."  *Id.* at 50:1 – 50:22.  Thus, the subcontractor did not install the landscaping for "Building 1" until the spring of 2011.  *Id.*

The foregoing testimony, which clearly details various "punch list" items that Plaintiffs worked on in 2011, is in sharp contrast to Baker's affidavit in support of the instant motions.  In his affidavit, Baker now attests that "[t]here was no 'new work' performed at the Project in

2011." Baker Aff. ¶ 13.  He asserts that, during questioning at the deposition, Plaintiffs'
attorneys did not distinguish between work "performed and originated on the Project in 2011
which was required under the Contract and had not been previously performed" and "repair,
correction and/or replacement work undertaken at the Project in 2011 because the work
previously performed was defective" or otherwise out of compliance with the Contract
requirements.  *Id.* ¶ 12.  Baker maintains that the sole "exception" to his general representation
that "*none* of the work performed in 2011 was newly originated Contract work" (*id.* ¶ 15
(emphasis in original)) relates to "certain landscaping obligations" of Sala, the landscaper,
"under its subcontract at Building No. 1."   In his affidavit, Baker characterizes the landscaping
work as warranty work:  because "some plants, trees and grassed areas" that the landscaper
installed in November or early December did not survive that winter, "[i]n order to comply with
its one-year warranty," Sala returned in 2011 to "reseed[]," "correct[] drainage work" where
water had been pooling and "replace[] dead flora.  *Id.* ¶ 16.  Plaintiffs argue that the Court must
disregard Mr. Baker's affidavit filed in support of the instant motion as it disavows his
deposition testimony.  Pls.' Opp. 10-11.

In support of their opposition, Plaintiffs also offer an affidavit from Barron Rathjen
("Rathjen"), who served as Shepardville's finish carpentry foreman on the Project.  Rathjen Aff.
¶ 2.  Rathjen attests that, for approximately two and one half days during the weeks ending April
1 and May 6, 2011, he and another Shepardville finish carpenter, Nahoum Jerenzano
("Jerenzano"), "installed door hardware required by Shepardville's subcontract."  *Id.* ¶¶ 4-7.
Rathjen does not provide any further description of the work.  Shepardville's payroll records for
the weeks ending April 1 and May 6, 2011 indicate that Rathjen and Jerenzano worked at

Vineyard Commons during those weeks for less than twenty hours each week, but do not otherwise describe the work that the men performed.  Rathjen Aff. Ex. B (payroll records).

### B.  The Tolling Agreement

The parties entered a tolling agreement on February 17, 2012 (the "Tolling Agreement"). Sitaras Aff. Ex. A at 2.  Pursuant to the terms of the Tolling Agreement, Plaintiffs agreed to "temporarily forebear our right to pursue a formal claim" under the bond for Vineyard Commons "provided that it does not jeopardize our rights under [them]."  *Id.*  In turn, J.K. Scanlan and Arch agreed to honor a payment plan starting on February 29, 2012, wherein it would submit incremental payments over a ten-month period until it paid its debt in full.  *Id.*  The parties "acknowledge[d] and agree[d] to toll any applicable contractual or statutory limitation period until 30 days after" the due date for the final payment under the new payment plan, and that "our rights to pursue a claim on the respective payment bonds … will not be impaired and/or time barred by entering into this payment arrangement, in the event that [J.K. Scanlan] fails to follow the payment plan."  *Id.*

### C.  The Instant Actions

Both Plaintiffs commenced the instant actions on April 26, 2012, alleging that J.K. Scanlan failed to pay money contractually owed to them and that Arch, pursuant to the Bond, can be held responsible for payment.  *See* Compl.

Arch moves for summary judgment on the grounds that Plaintiffs failed to file their suits within the one-year limitation period set forth in the Bond.  Arch argues that the one-year limitation period must be measured from December 9, 2010 because the Trip Report clearly provides that J.K. Scanlan ceased work on the Project "on or about December 9, 2010," Def.'s 56.1 Stmt. ¶ 4, and no "punch list items" existed.  *Id.* ¶ 7.  Arch contends that the only work

11

performed after December 9, 2010 "was remedial warranty work, i.e., the repair, correction or replacement of work performed on the Contract prior to December 9, 2010," which, as a matter of law, cannot extend the limitation period set forth in the Bond.  Def.'s Mem. 1.

Plaintiffs assert that Arch waived any potential contractual statute of limitations argument by entering the Tolling Agreement.  Pls.' Opp. 3-4.  Plaintiffs further contend that Arch has failed to establish that the actions are time-barred because subcontractors continued to perform work on the Project in 2011, including installation work (*id.* at 6-7), and the limitations period in the Bond starts to run from the date on which J.K. Scanlan "ceased work," not from the date of completion.  Pls.' Resp. Def.'s 56.1 Stmt. ¶ 5.  Plaintiffs also argue that it does not matter whether this work is "punch list work," remedial work or work contemplated by the Construction Contract, and the Bond does not distinguish between *types* of work—it only states that no suit shall be commenced within a year from the date the Principal "ceased work"—and in any event, the Bond should be "strictly construed" against the surety.  Pls.' Opp. 9.  Finally, Plaintiffs argue that the Court must disregard the Baker Affidavit submitted in support of Arch's motion papers because it contradicts his previous deposition testimony.  *Id.* at 10-11.

## II.    Legal Standard

Generally, in accordance with Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment

is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). Additionally, it is well-settled that a district court may not make credibility determinations on a motion for summary judgment.  *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.") (quoting *Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007)).

However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*,

477 U.S. 242, 256–57 (1986)).  While a party cannot create a genuine issue of fact by submitting

an affidavit disputing his own prior sworn testimony, "a material issue of fact may be revealed

by his subsequent sworn testimony that amplifies or explains, but does not merely contradict, his

prior testimony, especially where the party was not previously asked sufficiently precise

questions to elicit the amplification or explanation." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d

Cir. 1996) (citations omitted).

## III.   Discussion

### A.  The Court Cannot Determine Whether Plaintiffs' Claims Are Time-Barred Based on the Record Presented

Arch bears "the burden of making a prima facie showing that the limitations period had

expired before [Plaintiffs] filed [this] action." *Precision Stone, Inc. v. Arch Ins. Co.*, 472 F.

Supp. 2d 577, 582 (S.D.N.Y. 2007) (citing *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir.

1995)), *amended in part*, No. 04 Civ. 9996 (RWS), 2007 WL 1975487 (S.D.N.Y. July 6, 2007),

*and aff'd in part, rev'd in part*, 584 F.3d 33 (2d Cir. 2009).  New York courts construe bonds

like any other contract in order to determine the parties' rights and obligations thereunder.  *Arch

Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 40 n.4 (2d Cir. 2009) (citations omitted); *see also,

e.g.*, *EM Ltd. v. Repub. of Argentina*, 382 F.3d 291, 292 (2d Cir. 2004) (construing the language

of bond documents presents a "simple question of contract interpretation").  "A subcontractor is

bound, as a third-party beneficiary, to the terms of a material and labor payment bond entered

into specifically to secure payment to such parties," and New York courts have routinely upheld

the validity of one-year limitation periods such as that at issue here.  *Inner City Drywall Corp. v.

Reliance Ins. Co.*, 263 A.D.2d 438, 439, 694 N.Y.S.2d 31 (App. Div. 1st Dep't 1999) ("a

provision setting forth a reasonable, albeit abbreviated, limitation period is valid and

enforceable"). However, to the extent that provisions of a surety bond issued by a compensated surety are ambiguous, courts construe them against the surety. *See, e.g.*, *Dupack v. Nationwide Leisure Corp.*, 73 A.D.2d 903, 905, 424 N.Y.S.2d 436, 439 (App. Div. 1st Dep't 1980) ("ambiguity is to be resolved in favor of those to be protected"); *accord Nobel Ins. Co. v. City of New York*, No. 00 Civ. 1328 (KMK), 2006 WL 2848121, at *10 (S.D.N.Y. Sept. 29, 2006).

Here, the Bond provides that the applicable limitations period starts the moment when J.K. Scanlan, the principal, "cease[s] work on said Contract," i.e., the Construction Contract. Baker Aff. Ex. 1 (Bond). In this context, New York courts define "cease[] work" according to "its plain and ordinary meaning"—when labor ceases. *See, e.g.*, *J&A Concrete Corp. v. St. Paul Mercury Ins. Co.*, 48 A.D.3d 334, 851 N.Y.S.2d 548 (App. Div. 1st Dep't 2008); *Sea Crest Constr. Corp. v. Amwest Surety Ins. Co.*, 263 A.D.2d 433, 693 N.Y.S.2d 134 (App. Div. 1st Dep't 1999). Given that the Bond defines claimants to include subcontractors—i.e., the subcontractors are third-party beneficiaries of the Bond—and given that the subcontract work on the Project was derivative of work called for by the Construction Contract, the Court construes the phrase "work under said Contract" to include work called for by the Construction Contract as well as the subcontracts entered by J.K. Scanlan.[8]

The Construction Contract defines its "date of final completion" as the date on which the HUD Representative signs the final Trip Report, provided that the Chief Architect endorses it thereafter. Baker Aff. Ex. 2 (Construction Contract Art. 2 ¶ E). It is undisputed that the HUD Representative signed, and the Chief Architect endorsed, the Trip Report by December 10, 2010

---

[8] On this point, the Court finds the reasoning of *Eagle Fire Protection Corp. v. First Indemnity of America Ins. Co.*, 678 A.2d 699, 705-07, 145 N.J. 345 (N.J. 1996), persuasive. In that case, "the New Jersey Supreme Court held that because general contractors may and often do choose to subcontract their work to others, retaining only supervisory responsibility, it would be irrational and inequitable to interpret a 'cease work' clause not to include the work completed by such subcontractors." *John A. Russell Corp. v. Fine Line Drywall, Inc.*, No. 05 Civ. 321 (WKS), 2007 WL 2821651 (D. Vt. Sept. 27, 2007) (citing *Eagle Fire*, 678 A.2d at 705-07).

(Def.'s 56.1 Stmt. ¶¶ 5-9).   It is also undisputed that the Trip Report specifies "100% completion" of contract work with "no punch-list items" and "no items of delayed completion." Baker Aff. Ex. 3.  The December 2010 Certificate of Substantial Completion similarly indicates the absence of punch list items, and certifies that the Owner could occupy the premises for their "intended use."  *See* Certificate of Substantial Completion.

However, it is likewise undisputed that J.K. Scanlan continued to oversee, and subcontractors continued to perform, work at Vineyard Commons in 2011.  Arch argues that the work performed on the Project in 2011 was entirely remedial, and therefore does not affect the limitations period, which started running in December 2010.  In support of its position, Arch relies upon cases differentiating "'punch list' work," or "work called for by the original contract (or subcontract) which the contractor (or subcontractor) has not satisfactorily completed," *Precision Stone*, 584 F.3d at 37 (citation omitted), from remedial work.  Def.'s Mem. 6-7; *Cabrini Med. Ctr. v. Desina*, 64 N.Y.2d 1059, 479 N.E.2d 217 (N.Y. 1985) ("work performed by defendants' masonry subcontractor within six years of the commencement of the action was at most incidental to construction of the building and cannot serve to extend the accrual date of plaintiff's cause of action.").  Whereas courts have deemed punch list work pursuant to a contract sufficient to prevent a statute of limitations from running (*see, e.g.*, *J. Caiazzo Plumbing and Heating Corp. v. United States Fidelity and Guar. Co.*, No. 02 Civ. 10164 (BSJ), 2004 WL 2848548, at *1 (S.D.N.Y. Dec. 9, 2004); *Constr. Specialties v. Hartford Ins. Co.*, 97 A.D.2d 808, 468 N.Y.S.2d 675 (App. Div. 2d Dep't 1983)), "it is settled that remedial work is insufficient to extend the stated period of limitation."  *Inner City Drywall*, 263 A.D.2d 438.

Even accepting Arch's position—that remedial work would not delay the commencement of the limitations period set forth in the Bond, but contract work would—the Court finds that the

inconsistencies between Baker's deposition testimony and his affidavit create a genuine issue of material fact concerning the nature of the work performed at Vineyard Commons in 2011.  In particular, the Court rejects Arch's contention that Baker's affidavit and deposition "contain unambiguous statements that only remedial work, and not delayed completion work, was performed after December 9, 2010."  Def.'s Reply Br. 10 (emphasis removed).

Indeed, while Arch characterizes Baker's affidavit and deposition testimony as "completely consistent" in their "clear and flat-out statements" that "the only work performed after December 9, 2010 was remedial work and that no new, delayed contracted-for work [was] performed after that date" (Def.'s Reply Br. 8), the clear record proves otherwise.  Among other things, Baker testified that he inspected remedial work *and* "punch list" work performed in "completion [of] the original contract," "not change order items," in 2011—"obviously the owner came up with a list of some items that needed to be addressed … some of which needed to be corrected or repaired *or finished*."  Ahern Aff. Ex. A (Baker Dep. 46:15 – 47:9) (emphasis added).  Baker testified that subcontractors "completed" landscaping work, drainage and "blueprint" work on the Project after March 2011.  *Id.* at 47:10 – 50:18.  Although, at one point, Baker testified that "it appears that" the April 2011 "open items" list only included "repair items" (*id.* at 152:1 – 153:11), he also testified that "the work that [Shepardville] did [in 2011] was in correction *and* completion of their subcontract work" (*id.* at 159:12 – 160:7 (emphasis added)), and that Sala, the landscaper, performed "new work," and "not corrective work," in 2011 (*id.* at 153:15 – 154:5; 158:14 – 159:8).  As Arch notes, "[w]ork," in the parlance of the construction industry, "means the physical work of furnishing labor and materials to the contract."  Def.'s Mem. 8.

That Baker's affidavit seeks to clarify the purportedly remedial nature of the work performed in 2011 only creates conflict, rather than certainty, in the record.  For instance, regarding landscaping, Baker testified:

> Q.      You had mentioned earlier, I believe your testimony was that *landscaping had to be completed in the spring of 2011, correct?*
>
> *A.      Correct.*
>
> Q.      And do you know specifically what the landscaper completed in the spring?
>
> A.      Well, the project was – it was one project, but it was phased in the sense that it was multiple buildings.  So as we would turn over a building, we would landscape that building.
>
> So some buildings were landscaped in 2010 as we turned them over, and some buildings, as we turned them over in the fall or winter of 2010, were not landscaped as they were not able to be because of the weather.
>
> We had areas where we had landscaped things where we had issues with dead plants … *And we had issues where we needed to landscape a building because it finished in 2010 in December, and it couldn't be landscaped at that time.*
>
> The areas were prepared, structured, made for that time and then addressed in the spring.
>
> Q.      And do you recall which particular buildings were landscaped in the spring of 2011?
>
> A.      It would have been Building 1.

Ahern Aff. Ex. A (Baker Dep. 50:1 – 52:1) (emphasis added).  Yet, Baker's averments in his affidavit suggest a concept entirely distinct from, rather than "completely consistent" with, his deposition testimony:  he states that Sala returned to the premises in 2011 to comply with a one-year warranty by replacing dead plants, not to perform new work.   Baker Aff. ¶¶ 15-16.  Assessing credibility, choices between conflicting versions of the events and weighing of the

evidence are not matters for the Court to resolve on summary judgment, *Brine*, 85 F.3d at 1011, and the Court is bound to resolve all factual doubts in the non-movant's favor. *Omya*, 653 F.3d at 164. The inconsistencies between Baker's various statements concerning the nature of the work performed in 2011 are, at this juncture, therefore irresolvable.

In light of Baker's testimony characterizing of at least some of the work performed on the Project in 2011 as "completion to the original contract" and "punch list" work, the Court cannot conclude that the work called for by the Construction Contract, or Plaintiffs' subcontracts, ceased in December 2010. *Precision Stone*, 584 F.3d at 39; *Constr. Specialties*, 97 A.D.2d 808 (affirming trial court's denial of summary judgment due to factual ambiguity concerning "whether the contractor defendant, who was principal on a surety bond with appellant, in effect continued to work on the project by having plaintiff [subcontractor] perform punch-list work less than one year before plaintiff commenced this action."); *Sanford Const. Co. v. McGee Masonry, Inc.*, No. 72 Civ. 491E, 1987 WL 9396, at *2-*3 (W.D.N.Y. Apr. 6, 1987) (holding that the contractual period of limitations began to run, pursuant to surety bond, when general contractor "ceased all work under the contract, *including* so-called 'punch list items,' and not when such obligations were substantially accomplished" (emphasis added)); *cf. Desina*, 64 N.Y.2d at 1061 ("[t]he repair work performed by defendants' masonry subcontractor … installation of some eight square feet of back-up concrete block – was at most incidental to construction of the building," thus could not "serve to extend the accrual date of plaintiff's cause of action"). Contrary to Arch's assertions, this is not a case like *J&A Concrete*, in which the facts are unambiguous that "the contractor stopped performing labor on the project two years before plaintiff commenced the action." 48 A.D.3d 334. Nor is this a case where the nature of the work performed was solely and indisputably incidental. *Cnty. of Nassau v. H. Sand & Co., Inc.*, 144

A.D.2d 619, 621, 534 N.Y.S.2d 709 (App. Div. 2d Dep't 1988) (upholding trial court's determination that "evidence of the routine recalibration of temperature controls was not proof that actual construction had not already been completed ... but merely disclosed that an incidental punch list item relating to the project remained open").

Accordingly, Arch's motion for summary judgment is DENIED. The Court need not reach Plaintiffs' arguments concerning the Tolling Agreement in light of the ambiguity in the record concerning the date on which contract work ceased.[9]

## IV.   Conclusion

For the reasons set forth above, Arch's motions for summary judgment are DENIED. The Clerk of the Court is respectfully directed to terminate the motions, Doc. 31 (Case No. 12 Civ. 3346) and Doc. 27 (Case No. 12 Civ. 3347). All parties, including J.K. Scanlan, are directed to appear before the Court for a status conference on **September 18, 2014 at 9:30 a.m.**

It is SO ORDERED.

Dated:   August 26, 2014
         New York, New York

_____
Edgardo Ramos, U.S.D.J.

---

[9] The Court also notes that, in support of its Reply, Arch submits a final payment application which purportedly invoices all of Shepardville's work as 100% complete as of December 15, 2010 (Novak Aff. Ex. 1, Doc. 44). While Arch claims that this invoice demonstrates that Shepardville completed its work by December 15, 2010, the document does not, as Arch contends, foreclose the possibility that so-called "punch list" items remained. At his deposition, regarding this very pay requisition from Shepardville, Baker testified as follows:

> Q:   So they had not billed the retainage ... because they still had punch list work to do, and now they are billing all the retainage?

> A:   Why they billed, the mechanism and the thought process as to why they did it, I can't speak to that. And just because the sub[contractor] bills you, it doesn't mean that it's right or due. Sub[contractor]s bills us all the time when they think they're owed money, and they're not.

Ahern Aff. Ex. A (Baker Dep. 146:7 – 147:8). In any event, at most, Arch's argument concerning the requisition would only establish that Shepardville, and not the other subcontractors, may have completed their work in 2010.

20